**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

**WILLIAM D. AARON, JR. ET AL.**                                    **CIVIL ACTION**

**VERSUS**                                                              **No. 22-9
c/w 22-2070
c/w 20-1253
c/w 22-4518
c/w 19-10341
c/w 20-3189
c/w 23-5056
REF: 20-1253**

**ILLINOIS NATIONAL INSURANCE**                            **SECTION I**
**COMPANY ET AL.**

### ORDER & REASONS

Before the Court are cross motions for partial summary judgment filed by the Federal Deposit Insurance Corporation ("FDIC")[1] as receiver for First NBC Bank ("First NBC" or the "Bank") and a group of insurers who issued insurance policies to First NBC.[2] The motions concern the coverage of 2016-2017 insurance policies issued by defendants U.S. Specialty Insurance Company ("USSIC"), XL Specialty Insurance Company, Illinois National Insurance Company ("Illinois National"), Freedom Specialty Insurance Company, Markel American Insurance Company, and Berkshire Hathaway Insurance Company (collectively, the "2017 Insurers").

---

[1] R. Doc. No. 317.
[2] R. Doc. No. 344.

The 2017 Insurers move for summary judgment arguing that the FDIC's claims are excluded from coverage under the policies.[3] The FDIC also filed a motion for summary judgment, arguing the policies do cover the claims.[4] Both motions are opposed.[5]

For the reasons that follow, the Court grants the FDIC's motion for partial summary judgment and denies the 2017 Insurers' motion for partial summary judgment.

## I.    FACTUAL BACKGROUND

This civil action stems from the failure of First NBC.  First NBC procured two successive directors' and officers' liability ("D&O") insurance policies. The motions currently before the Court concern the second policy period, *ie.* the 2017 policy period. During the 2017 policy period, First NBC had acquired coverage for its directors and officers pursuant to eight insurance policies.[6] The primary and underlying policy was

---

[3] R. Doc. No. 344. Pursuant to an order of this Court, the parties were permitted to file motions regarding the "application of inter-related wrongful acts and prior notice provisions in the 2017 towers as to FDIC's claims." R. Doc No. 265, at 2.

[4] R. Doc. No. 317. The FDIC's motion is adopted and joined by multiple parties. R. Doc. No. 318 (William D. Aaron, Jr., Herbert Anderson, Dale N. Atkins, John C. Calhoun, William Carrouche, John F. French, Leon Giorgio, Jr., Shivan Govindan, Lawrence Blake Jones, Hermann Moyse, III., Grish Roy Pandit, James C. Roddy, Charles C. Teamer, Sr., Joseph F. Toomy, R. Michael Wilkinson, and Stephen Petagna (collectively, the "independent directors") adopt the FDIC's motion); R. Doc. No. 350  (Fred Beebe joins the FDIC's motion); R. Doc. No. 369 (Frank Fugetta, Michael Lulich, Louis Ballero, George Jourdan, and William Roohi adopt the FDIC's motion). The independent directors also filed their own reply in support of the FDIC's motion. R. Doc. No. 416.

[5] R. Doc. No. 360 (FDIC's opposition to insurers' motion); R. Doc. No. 361 (insurers' opposition to FDIC's motion). The FDIC's opposition is adopted by Frank Fugetta, Michael Lulich, Louis Ballero, George Jourdan, and William Roohi. R. Doc. No. 369.

[6] R. Doc. No. 344-40, at 15.

issued by USSIC (the "Primary Policy"). Additionally, First NBC had excess policies ("2017 Excess Policies," also referred to as the "2017 Policies" when the Primary Policy is included) issued by seven insurers ("2017 Excess Insurers"): USSIC, XL Specialty Insurance Company, Illinois National, Freedom Specialty Insurance Company, Markel American Insurance Company, and Berkshire Hathaway Insurance Company.[7] The 2017 Policies are "claims-made" policies.[8] As such, the 2017 Policies provide insurance coverage only for claims that are made against the insured within the policy period.[9]

The FDIC "alleges Claims against Ryan for breach of fiduciary duty and gross negligence in approving certain loan approvals at the CEO level [ ] and against Director Defendants and Ryan for gross negligence in approving separate loans at the director level."[10] The parties dispute whether these claims were first made within the policy period or if they were made under the prior policy period and are therefore not subject to coverage pursuant to the "claims-made" policies.

## II.    LEGAL STANDARDS

### a.  SUMMARY JUDGMENT

Summary judgment is proper when, after reviewing the materials in the record, a court determines that there is no genuine dispute of material fact and the

---

[7] R. Doc. No. 317-1, at 2; R. Doc. No. 344-40, at 15. Illinois National issued two excess policies.
[8] R. Doc. No. 344-40, at 5 (2017 Insurers' motion); R. Doc. No. 317, at 2 (FDIC's motion).
[9] R. Doc. No. 344-40, at 5 (2017 Insurers' motion); R. Doc. No. 317, at 2 (FDIC's motion).
[10] R. Doc. 360-2, at 4.

movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of a material fact; it need only point out the absence of evidence supporting the other party's case. *Id.*; *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195–96 (5th Cir. 1986) ("There is no sound reason why conclusory allegations should suffice to require a trial when there is no evidence to support them even if the movant lacks contrary evidence.").

Once the party seeking summary judgment carries that burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Rather, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the nonmovant fails to meet their burden of showing a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075–76.

"Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (citations omitted). The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue. *See Anderson*, 477 U.S. at 248. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255.

### b. POLICY INTERPRETATION

The parties do not dispute that Louisiana law governs the interpretation of the insurance policies at issue in this case. Pursuant to Louisiana law, "[a]n insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil Code." *Cadwallader v. Allstate Ins. Co.*, 848 So.2d 577, 580 (La. 2003). The Louisiana Civil Code provides that "[i]nterpretation of a contract is the determination of the common intent of the parties." La. Civ. Code Ann. art. 2045 (1987); *see also Cadwallader*, 848 So.2d at 580; *La. Ins. Guar. Assoc. v. Interstate Fire & Cas. Co.*, 630 So.2d 759, 763 (La.1994). An insurance contract must be "construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to or made a part of the policy." La. Stat. Ann. § 22:654 (2004).

5

"The words of a contract must be given their generally prevailing meaning." La. Civ. Code Ann. art. 2047 (1987); *see also Cadwallader*, 848 So.2d at 580. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code Ann. art. 2046 (1987). "If the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written." *Cadwallader*, 848 So.2d at 580. "The language of an insurance policy may be general without being ambiguous." *Kazan v. Red Lion Hotels Corporation*, 346 So.3d 267, 270 (La. 2022).

"Parol or extrinsic evidence is generally inadmissible to vary the terms of a written contract unless the written expression of the common intention of the parties is ambiguous." *RSUI Indem. Co. v. Am. States Ins. Co.*, 127 F. Supp. 3d 649, 658 (E.D. La. 2015) (Africk, J.), *aff'd*, 667 F. App'x 475 (5th Cir. 2016) (quoting *Campbell v. Melton*, 817 So.2d 69, 75 (La. 2002)). "Accordingly, when a provision is ambiguous, 'parol evidence is admissible to clarify the ambiguity.'" *Id.* (citing *Diefenthal v. Longue Vue Mgmt. Corp.*, 561 So.2d 44, 51 (La.1990)).

"Where . . . an insurance policy includes ambiguous provisions, the '[a]mbiguity . . . must be resolved by construing the policy as a whole; one policy provision is not to be construed separately at the expense of disregarding other policy provisions.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 207 (5th Cir. 2007) (quoting *La. Ins. Guar. Assoc.*, 630 So.2d at 764). "The court should construe the policy 'to fulfill the reasonable expectations of the parties in light of the customs and

usages of the industry.'" *Id.* "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." La. Civ. Code Ann. art. 2053 (1987). "An insurance contract, however, should not be interpreted in an unreasonable or strained manner under the guise of contractual interpretation to enlarge or restrict its provisions beyond what is reasonably contemplated by unambiguous terms or achieve an absurd conclusion." *In re Katrina Canal Breaches Litig.*, 495 F.3d at 208.

"If after applying the other general rules of construction an ambiguity remains, the ambiguous contractual provision is to be construed against the drafter, or, as originating in the insurance context, in favor of the insured." *In re Katrina Canal Breaches Litig.*, 495 F.3d at 207 (quoting *La. Ins. Guar. Assoc.*, 630 So.2d at 764)). Accordingly, "[an] insurance policy is construed against an insurer and in favor of coverage *only* when an ambiguity remains after applying the aforementioned general rules for the interpretation of contracts." *Kazan*, 346 So.3d at 270 (emphasis added).

## III. ANALYSIS

The 2017 Insurers argue that the FDIC's claims against the 2017 Insurers are not covered by the excess policies because they were not "first made" during the policy period.[11] The 2017 Insurers rely, in part, on the Interrelationship of Claims ("IOC") provision in the 2017 Primary Policy which states:

> All Claims alleging, arising out of, based upon or attributable to the same facts, circumstances, situations, transactions or events or to a

---

[11] R. Doc. No. 344-40, at 1.

series of related facts, circumstances, situations, transactions or events
will be considered to be a single Claim and will be considered to have
been made at the time the earliest such Claim was made.[12]

The 2017 Insurers argue that the IOC Provision requires a claim be "first made"
during the policy period and subsequent related litigation will be deemed "first made"
at the time of the earliest related claim.[13]

All of the excess policies, except the policies issued by Illinois National and
USSIC, provide coverage on the same terms as the USSIC Primary Policy.[14] The
excess policies issued by Illinois National and USSIC provide coverage based on the
terms and conditions as stated in the Illinois National 2017 Side A Policy. The Illinois
National 2017 Side A Policy's terms, similarly, provide:

Claims first made against an Insured Person and Pre-Claim Inquiries
first reported by an Insured Person prior to the inception date of this
policy, and Claims deemed as first made against an Insured Person and
Pre-Claim Inquiries deemed as first reported by an Insured Person
under any directors and officers liability policy in force prior to the
inception date of this policy, are not covered under this policy.[15]

Additionally, all of the 2017 Insurers rely on the Prior Notice Exclusion in the
USSIC Primary Policy.[16] The Prior Notice Exclusion excludes from coverage a claim

arising out of, based upon or attributable to facts or circumstances
alleged, or to the same or related Wrongful Acts alleged or contained, in
any claim which has been reported or with respect to which any notice
has been given, under any policy of which this Policy is a renewal or
replacement or which it may succeed in time.[17]

---

[12] *Id.* at 12.
[13] *Id.* at 22.
[14] *Id.* at 11.
[15] *Id.* at 16.
[16] *Id.* at 17.
[17] *Id.* at 17.

The 2017 Insurers argue that the notices of related provided under the prior policies precludes the insureds from claiming coverage under the 2017 policies.[18]

In its motion and its response to the 2017 Insurers' motion, the FDIC argues that the Prior Notice Exclusion is inapplicable because none of the prior noticed matters overlap with the FDIC's claims and because the prior noticed matters lack a causal connection with the FDIC's claims.[19] The FDIC argues that the IOC Provision also does not preclude its claims because the IOC Provision only aggregates claims during the policy period for purposes of calculating limits and retentions.[20] According to the FDIC, the Prior Notice Exclusion and the IOC provision "fail to *unambiguously* exclude coverage" as required by Louisiana law.[21]

Pursuant to Louisiana law, the Court begins its analysis with the text of the policies. Both parties agree that the critical language is "arising out of, based upon, or attributable to" for both the Prior Notice Exclusion and the IOC Provision. This language dictates how connected a claim must be to a previous claim in order to be excludable under these provisions.

The 2017 Insurers argue that this language should be construed broadly and only requires a "connection" with the prior claim.[22] The FDIC argues that the

---

[18] *Id.* at 28–29.
[19] R. Doc. No. 317-1, at 3; R. Doc. No. 360, at 5.
[20] R. Doc. No. 317-1, at 3.
[21] *Id.* at 4.
[22] R. Doc. No. 361, at 14.

language requires a causal connection.[23] Both parties rely on cases interpreting relatively similar language in different contexts.

The plain text and the caselaw cited by the parties support a stronger relationship than the "mere connection" suggested by the 2017 Insurers. The text requires the claims to flow from the same circumstances, not merely be related in some incidental way. As argued by the FDIC, the plain text and caselaw support a causal relationship. However, the text does not require direct or proximate causation.

In the car insurance context, the Louisiana Supreme Court explained that it "define[s] 'arising out of' to mean 'originating from,' 'growing out of,' or 'flowing from' the use." *Bernard v. Ellis*, 111 So.3d 995, 1005 (La. 2012). The Court specifically rejected the argument that "arising out of" required a showing of "legal cause." *Id.* T]he term "arising out of" relates not to verb tense or the time that the claim arises, but rather to the source and nature of the claim." *Forrest as Tr. for Jack Thrash Forrest III Tr. v. Ville St. John Owners Assn., Inc.*, 259 So. 3d 1063, 1073 (La. App. 4th Cir. 2018) (describing the holding of *Louisiana Insurance Guaranty Association v. Gugliemo*, 276 So.2d 720 (La. App. 1st Cir.1973), *writ refused* 279 So.2d 690 (La. 1973)). Accordingly, the language "arising out of" indicates a "but for" causal relationship without requiring a showing of direct or proximate causation. *Id.*; *see also Looney Ricks Kiss Architects, Inc. v. State Farm Fire & Cas. Co.*, 677 F.3d 250 (5th Cir. 2012) (determining that pursuant to Louisiana law "arising out of" requires "but for" causation in a breach of contract exclusion).

---

[23] R. Doc. No. 317-1, at 12.

This is consistent with how the U.S. Fifth Circuit Court of Appeals has defined "arising out of." "The phrase 'arising out of' is ordinarily understood to mean 'originating from,' 'having its origin in,' 'growing out of,' or 'flowing from.'" *Am. Guarantee and Liab. Ins. Co. v. 1906 Co.,* 129 F.3d 802, 807 (5th Cir. 1997) (interpreting an insurance provision using similar rules of construction pursuant to Mississippi law) (citing *Blue Bird Body Co. v. Ryder Truck Rental, Inc.,* 583 F.2d 717, 726 (5th Cir.1978)). "In the insurance context, this phrase is often interpreted to require a causal connection between the injuries alleged and the objects made subject to the phrase." *Id.*

This interpretation of "arising out of" comports with the plain text of the policy as well as the terms "based upon" and "attributable to." Both of these terms similarly convey a causal relationship. *See e.g., W.R. Starkey Mortg., LLP v. Chartis Specialty Ins. Co.,* No. 4:12-CV-219, 2014 WL 12596428, at *6 (E.D. Tex. Sept. 15, 2014) (holding that, pursuant to similar rules of construction pursuant to Texas law, "arising out of, based upon or attributable to" means there is "but for" causation). The Court therefore finds the meaning of "arising out of, based upon, or attributable to" is unambiguous. *See e.g., Forrest as Tr. for Jack Thrash Forrest III Tr.*, 259 So. 3d at 1074 ("Employing the statutory and jurisprudential rules of interpreting an insurance policy exclusion, we find the property damage exclusion, including the term "arising out of," [ ] is not ambiguous.").

The Court will next consider whether the FDIC's present claims arise out of, are based upon, or are attributable to the previous claims. The 2017 Insurers argue

that multiple related claims and notices were made or provided during the 2016 policy period and that these claims preclude the FDIC from bringing its present claims under the 2017 Excess Policies.

The first claim was an action brought by the Georgia Insurance Commissioner against First NBC and CEO Ashton Ryan. *State of Georgia ex. Rel. Hydgens v. Richard O'Dom et al.,* CV 2015-258501 (Ga. Super. Ct. 2015). The Georgia Insurance Commissioner alleged that First NBC was using straw entities to prop up Southern Casualty Insurance Company. *See generally id.*

The FDIC correctly notes that "[t]he 2017 Insurers identify no facts alleged in *Georgia* that even arguably give rise to the FDIC-R's Claims in the [present] [c]ase, much less explain[] how those Claims grew out of such facts."[24] There is no connection between the *Georgia* action and the FDIC's present claims except that they concern the same bank. The approval of each of these loans was an "independent business decision" by each individual director. *See e.g., Eureka Fed. Sav. and Loan Ass'n v. Am. Cas. Co. of Reading, Pa.*, 873 F.2d 229, 235 (9th Cir. 1989) ("the mere existence of an aggressive loan policy is insufficient as a matter of law to transform disparate acts and omissions made by five directors in connection with issuance of loans to over 200 unrelated borrowers into a single loss. . . [N]umerous intervening business decisions [ ] took place after the loan policy was initiated that required the exercise of independent business judgment.") *Certain Underwriters at Lloyd's of London v. Fed. Deposit Ins. Corp. for Omni Natl. Bank*, 723 F. App'x. 764, 768 (11th Cir. 2018)

---

[24] R. Doc. No. 360-2, at 18.

(unpublished) ("the continuing investments [ ] were not "interrelated wrongful acts" under the policy but rather were independent wrongful acts that occurred during the policy period."). This aligns with the treatment of the loan approvals in the related criminal case where the court explained that "[e]ach loan package imposed a 'new obligation' on Defendants to be truthful, and 'created a new, independent risk for the' Bank." *United States v. Ryan*, 580 F. Supp. 3d 359, 368 (E.D. La. 2022) (Fallon, J.).

In December of 2016, one of the directors, William Aaron, sent a notice of potential claims to the 2016 Insurers (the "Aaron Memo").[25] The notice identified twelve borrowing relationships that could give rise to a lawsuit based on their similarity to the claims in the *Georgia* action. The 2017 Insurers argue that the "Aaron Memo confirms that the [B]ank's alleged unsafe and unsound banking practices at issue in the *Georgia* Action extended beyond [Southern Casualty Insurance Company.]."[26]

The Aaron Memo identifies specific lending relationships that could give rise to a claim. But the Prior Notice Exclusion does not apply to notices of *potential* claims; it applies to notices of claims. This definition of a "claim" in the policy is limited to written demands for relief, proceedings (civil, criminal, or dispute resolution), and investigations.[27] The definition does not include potential future claims. The policy

---

[25] R. Doc. No. 344-40, at 15.
[26] *Id.* at 25.
[27] The Primary Policy states that a "Claim" means:
    (1) any written demand for monetary or non-monetary relief,
    (2) any civil proceeding commenced by service of a complaint or similar pleading,

clearly states that it applies to related facts, circumstances, or wrongful acts alleged

"in *any claim* which has been reported or with respect to which any notice has been

given."[28] The Aaron Memo is not a notice of a claim; it is a notice of *potential claims*.

Accordingly, the Aaron Memo is not a claim which can be applied in the Prior Notice

Exclusion or the IOC Provision.

The next allegedly relevant actions are *Kinzler v. First NBC Bank Holding*

*Company*, No. CV 16-4243 (E.D. La.) and *Smith v. Ryan et al.*, CV 16-17001 (E.D.

La.). In *Kinzler*, the shareholders of First NBC Bank Holding Company ("Holding

Company") sued the Bank's Holding Company and its Chief Executive Officer and

Chief Financial Officer alleging violations of securities laws by falsely portraying the

---

    (3) any arbitration, mediation or other similar dispute resolution proceeding,

    (4) any criminal proceeding commenced by return of an indictment, information or similar document,

    (5) any civil, criminal, administrative or regulatory investigation of an Insured Person commenced by his or her receipt of a target letter, Wells Notice or other written notice from an investigating authority (including a subpoena) identifying by name such Insured Person as an individual against whom a proceeding may be commenced; or

    (6) any formal civil, criminal, administrative or regulatory investigation of an Insured Person or the Company commenced by the filing or issuance of a notice of charges, formal investigative order or similar document identifying:

        (a) such Insured Person as a person against whom a proceeding described in subsection (2), (3) or (4) above may be commenced, or

        (b) the Company as an entity against whom a proceeding described in subsection (2), (3) or (4) above may be commenced, but only with respect to Securities Claims. Claim also means any appeal from, and any written request or agreement to toll or waive any applicable statute of limitations in connection with, any of the foregoing.

R. Doc. No. 344-14.

[28] R. Doc. No. 344-40, at 17 (emphasis added).

14

company's financial situation.[29] *Smith* was a shareholder derivative action against the directors and officers of the Bank's Holding Company. The complaint alleged that the defendants breached their fiduciary duties by disseminating false and misleading information to shareholders, failing to maintain internal controls, failing to oversee and manage the company, wasting corporate assets, unjustly enriching themselves, misappropriating company information, and violating the Exchange Act.[30]

The claims in both *Kinzler and Smith* broadly relate to First NBC's misrepresentation of its financial situation. The claims in those cases do not concern the approval of specific loans which are at issue in this case. Accordingly, there is no indication that First NBC's violation of securities laws and breaches of fiduciary duties arose from, were based upon, or were attributable to the same circumstances as the claims by the FDIC that specific directors improperly approved specific loans. Additionally, as mentioned previously, the decision to approve each loan was an independent business decision. While these loans may have contributed to the Bank's failing financial situation, that does not lead to a conclusion that the *Kinzler* and *Smith* actions amount to prior notice of the specific lending relationships at issue in this case or that *Kinzler* and *Smith* are interrelated with the specific lending relationships.

The 2017 Insurers also rely on a 2016 joint examination by the FDIC in its corporate capacity ("FDIC-C") and the Louisiana Office of Financial Institutions

---

[29] Civil Case No. 16-4243, R. Doc. No. 1.
[30] Civil Case No. 16-17001, R. Doc. No. 1.

("LOFI") which identified problems with the Bank's lending practices and non-compliance with laws and regulations.[31] Following the examination, First NBC entered into a consent order with the FDIC-C and LOFI. This consent order did require the Bank to improve its borrowing practices, including limiting the extension of credit to borrowers "classified as a loss, doubtful, or substandard."[32] But the fact that both actions have to do with lending is not itself determinative. The Prior Notice Exclusion does not require that the claims concern the same business practices. Instead, the lending relationships at issue here must arise out of, be based upon, or be attributable to the circumstances or wrongful acts identified in the examination. The consent order itself did not mention specific loan approvals.[33] Accordingly, it is unclear how this consent decree or the examination could serve as notice to the 2017 Insurers of specific claims, or wrongful acts underlying those claims or how this consent decree is sufficiently related to the specific lending relationships at issue in this action to render the FDIC's claims "first made" at the time of the joint examination.

Because none of the claims in the present action arise out of, are based upon, or are attributable to the circumstances or wrongful acts identified in the prior claims, the IOC Provisions and the Prior Notice Exclusion are not implicated. Accordingly, the Court need not consider the parties other interpretative arguments regarding the applications of the provisions.

---

[31] R. Doc. No. 344-40, at 9–10.
[32] *Id.* at 6.
[33] R. Doc. No. 317-1, at 15.

16

## IV.    CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the FDIC's motion for partial summary judgment is **GRANTED**.

**IT IS ORDERED** that the 2017 Insurers' motion for partial summary judgment is **DENIED**.

New Orleans, Louisiana, November 8, 2023.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

17